BROTHERHOOD OF RAILROAD TRAINMEN *v.*
ILLINOIS CENTRAL RAILROAD COMPANY

No. 42217 March 26, 1962 138 So. 2d 908

*Ramsey, Ramsey & Bodron,* Vicksburg, for appellant.

*Wise, Smith & Carter,* Jackson; *J. H. Wright, John W. Freels, John W. Foster,* Chicago, Illinois, for appellee.

854

GILLESPIE, J.

This appeal involves (1) whether the Public Service Commission has power to investigate and determine if a railroad company is violating Section 7759, Mississippi Code of 1942, known as the Full Crew Law, and (2) whether the evidence supported a finding that the railroad company was violating said statute.

The Brotherhood of Railroad Trainmen filed a petition with the Commission charging that the Illinois Central Railroad Company was violating the Full Crew Law and requesting a citation be issued commanding the railroad company to show cause why it should not be held for the penalty provided by Code Section 7759, and why it should not be ordered to cease violating said statute. The Commission issued the citation and the railroad company denied any violation of the statute and moved to dismiss the proceedings on the ground that the Commission was without jurisdiction. The motion to dismiss was overruled and a hearing was had, and the Commission entered an order finding that the

railroad company was operating its trains Nos. 205 and 208 between Vicksburg and Meridian in violation of Code Section 7759, and ordering the railroad company to cease and desist operating said trains Nos. 205 and 208 without a full crew as required by law. The railroad company appealed to the circuit court, which reversed the order of the Commission and dismissed the cause. The Brotherhood of Railroad Trainmen perfected an appeal to this Court.

We are of the opinion that the only material facts which the Commission could consider on the question whether appellee was violating the statute were facts concerning the crew itself, in short, whether there was a full crew within the meaning of the statute. The proof shows that trains Nos. 205 and 208 operate between Meridian and Vicksburg, and each of these trains, one traveling west and one traveling east, consists of an average of seven cars. The testimony on behalf of appellant showed without dispute that the train is powered by a diesel engine and not by steam. The railroad employs and pays the salaries of the following employees in the operation of said trains: (1) Engineer, (2) fireman, (3) conductor, (4) combination flagman and baggage man, and (5) a mail porter, whose duties consist mainly of handling mail pouches. There are other persons working on said train who are employees of the United States Post Office Department in the operation of the Railway Post Office. The train carries a passenger coach and the other cars consist of mail and baggage cars. The number of passengers normally carried by said train is negligible and according to the conductor, who testified for appellant, "(I)t is not really a passenger train anymore, it is a mail train." On an average day, each train carries between 500 and 600 sacks of mail. A train porter, or a pullman porter, or coach porter does not perform flagging service or other duties concerned with the actual operation of the train.

Neither does the mail porter or the mail handler qualify to perform any flagging service or other services in connection with the movement or safety of the train. Neither does the mail handler perform any services in connection with the passengers on said train, although he is under the control of the conductor and assists in such matters as handling a corpse on and off the train.

The first question for our decision is whether the Public Service Commission has jurisdiction to entertain the petition, conduct a hearing, make its findings as to whether there is a violation of Code Section 7759, and order the railroad company to cease and desist such violation.

Code Section 7820 is a part of Chapter 7, Title 28, Miss. Code of 1942, and is as follows:

"The commission to see that the laws are complied with.—It is the duty of the railroad commission to call for information from railroads and other common carriers from time to time, and to make investigations to determine whether the laws are being complied with on their several parts; and it is its duty to see that all the laws, civil and penal, whether contained in this chapter or not, affecting railroads and other common carriers, are complied with, and to prosecute all offenders."

The powers vested in the railroad commission under said Code Section 7820 are now exercised by the Public Service Commission under the terms of Code Section 7702. The Full Crew Law, Code Section 7759, is one of the laws affecting railroads concerning which the Public Service Commission has jurisdiction to make investigations to determine whether such law is being complied with on the part of the railroad; and it is the duty of the Public Service Commission to see to it that this law is enforced. We hold that the Commission is vested with jurisdiction to entertain petitions such as the one here in question and to make investiga-

tions in the manner followed in this case to determine whether or not the full crew law is being violated, and to issue appropriate orders that such violations cease if a violation is found.

 The enforcement of the order is another matter not here involved. The Commission itself has no power to issue injunctions or to enforce an injunction or to convict an offender. The statutes contemplate that if a prosecution of a railroad is to be had, it must be done in the criminal courts, and if a Commission order is not obeyed and enforcement procedure is necessary, the Commission may, in a proper case, apply to the chancery court for an injunction. Code Section 7716-30.

The next question for our decision is whether the proof in this case is sufficient to justify a finding by the Commission that appellee violated Code Section 7759 in the operation of trains Nos. 205 and 208. Section 7759 and Section 7760, providing the penalties for the violation of the Full Crew Law, are as follows:

"7759. Full crew law—prescribing number of employees for a train. It shall be unlawful for any railroad propelled by steam doing business in the State of Mississippi to operate or run over its lines, or any part thereof, or suffer or permit to be run over its lines, or any part thereof, outside of yard limits, any passenger, mail or express, train carrying passengers, or any freight, work or construction train without a crew consisting of not less than one engineer, one fireman, one conductor, one brakeman or porter and one competent flagman. It shall be unlawful for any such railroad to operate or run over its lines, or any part thereof, or suffer or permit to be operated or run over its lines, or any part thereof, outside of yard limits, any passenger, mail, express, freight, work or construction train, propelled by gasoline, electricity, or other form of motive power, except steam, without a crew consisting of not less than one engineer or motorman, one conductor

and one brakeman or baggageman, or competent flagman; provided, however, that if any such train mentioned in this section consists of three cars, an additional porter, brakeman, baggageman, or competent flagman shall be furnished, and on such trains of four cars or more, one additional man shall be added to the crew.''

"7760. Penalty for operating with short crews.—Any railroad doing business in the State of Mississippi who shall send out on its road, or any part thereof, outside of yard limits, any train of the classes enumerated in Sections 1 and 2 (Sec. 7759, supra) of this act, which is not manned in accordance with the provisions of these sections, shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than $100.00 nor more than $1,000.00 for each offense, and each violation of Sections 1 and 2 (Sec. 7759, supra) shall constitute a separate offense.''

 Both parties to this litigation concede that the Full Crew Law is a valid exercise of the police power of the State. Appellant contends that the statute is not penal. On the other hand, appellee contends that the statute is penal, and should be strictly construed. We hold that the statute is penal. It provides for a penalty of not more than $1,000 for each offense, which means that the railroad could be fined $1,000 each time it violated the statute. Obviously, this is a penal statute.

 Since the trains in question operate by diesel power, the second sentence of Section 7759 applies rather than the first sentence. These trains, Nos. 205 and 208, regularly carry more than four cars, and the minimum crew required by the statute is (1) an engineer or motorman, (2) a conductor, (3) a brakeman or baggageman, (4) an additional porter, brakeman, baggageman or competent flagman, and (5) one additional man shall be added to the crew. The question narrows to whether the mail porter, or as some refer to him, the mail handler, can be counted as one of the five required to

constitute a full crew. Appellant contends that the additional man required to be added to the crew means a man qualified to assist in operating the train such as flagging, and that since the mail porter is not so qualified, he is not a member of the crew. This contention would carry more force but for the fact that one man may be a porter, brakeman, baggageman, or flagman. The statute says that a porter may be a member of the crew. The statute refers to passenger, mail, express, freight and work trains. It is clear, therefore, that the porter who would qualify as a member of the crew on a mail train would be a mail porter and not a passenger porter because a passenger porter would have no services on a mail train.

The proof shows that there are pullman porters, passenger or coach porters, and mail porters, and the proof further shows that none of these porters perform services other than being a porter. In other words, they do not perform any services in connection with the safety of operations, such as flagging. Therefore, a porter, being named in the statute, may be one of the five-man crew required by the statute. The plain words of the statute require this construction.

We conclude, therefore, that the circuit court correctly reversed the case and dismissed the proceedings.

Affirmed.

*McGehee, C. J.,* and *Kyle, Ethridge* and *Jones, JJ.,* concur.

WILSON *v.* STATE

No. 42139 March 26, 1962 140 So. 2d 275

*Kelly McKoin*, Biloxi, for appellant.

G. *Garland Lyell, Jr.*, Asst. Atty. Gen., Jackson, for appellee.

LEE, P. J.

Willie Wilson was indicted for the forcible and felonious rape of a female. The jury found him guilty as charged, and he was sentenced by the court to suffer the death penalty. From the judgment entered, he appealed.

Prior to the arraignment, defendant's counsel suggested in writing that his client was then insane and was not capable of making a rational defense, and that this issue should first be settled by a jury. In like manner, by a separate motion, he asked, in accordance with Sec. 2575.5, Code 1942, Rec., that the defendant be examined by a competent psychiatrist, to be selected by the court, in order to determine the defendant's ability to make a defense. Both motions were sustained, and Dr. G. T. Sheffield, a psychiatrist, was appointed to make the examination. A jury was empaneled, and, after hearing the evidence pro and con, returned the following verdict: "We, the jury, find the defendant sane and mentally capable of conducting a rational defense." Without detailing the evidence, it is sufficient to say that it fully warranted the jury in returning such verdict.

Defendant's motion for a special venire was sustained, and, at the same time, namely, June 28, 1961, the venire was drawn returnable on July 5th thereafter.

On July 5, 1961, counsel for defendant presented a bill of exceptions to certain rulings of the court allegedly made during the sanity trial. The trial judge did not sign the same; but, on the bottom of the motion, he wrote these words: "The Court Reporter's record shall be made a part of this Bill of Exceptions and when this is done the same shall then constitute the bill of exceptions as signed by me this 5th day of July, 1961, *as I*

*do not recall things happening the way counsel for defendant alleges."* (Emphasis supplied.)

The court also overruled the defendant's motion to quash the indictment on the ground that Negroes were systematically excluded from jury service in Harrison County.

On his appeal here, the appellant has assigned and argues four propositions: The trial court erred (1) in overruling his bill of exceptions to rulings allegedly made during the sanity trial; (2) in overruling his motion to quash the indictment; (3) in overruling his motion for a new trial based on the ground that the verdict of the jury was against the overwhelming weight of the evidence; and (4) in admitting evidence concerning a charge of armed robbery.

## THE BILL OF EXCEPTIONS.

Secs. 1531-1535, inclusive, Code of 1942, Rec., deal with the question of bills of exception. The trial judge refused to sign the proposed bill of exceptions, saying "I do not recall things happening the way counsel for defendant alleges." In other words, the truth of the case was not fairly stated therein. Sec. 1532 of the Code. Obviously the appellant is bound by the bill of exceptions as signed by the judge. If it in fact stated the truth of the matter, a way was open to the appellant to make it available, even though the judge did not sign it. Secs. 1533, 1534 of the Code. He did not avail himself of such remedy.

In another point, the appellant argues that the trial judge, before the selection of the jury had begun, remarked that defendant was charged with rape and armed robbery. He does not state where such remarks could be found in the record. The Court has not found it. Obviously, the trial judge, by his refusal to sign the bill of exceptions, adjudicated that this did not happen.

The appellant's complaint therein as to the competency of certain jurors is not sustained by the voir dire examination as shown in the record.

The appellant further said that the attorney for the State repeatedly referred to the fact that he had been indicted for the crime of rape. He mentions questions which may be found at pp. 17, 33, 56 and 57 of the record. In the first instance, during the cross-examination of the appellant's grandmother, who was trying to testify that he was insane, counsel for the State elicited from her that she had talked to her grandson on Sunday and she admitted that he told her that he had done wrong and he was sorry for it. In the second instance, the mother of the appellant told the District Attorney that her son looked then, during the trial, just like he did on Saturday before the offense happened on Sunday. In the third instance, during the examination of officer Eddie Van, the District Attorney asked if the witness had talked to the appellant on the night that this crime was committed that afternoon. The court corrected the question so as to say, "The alleged crime."

Here was the situation: A suggestion of insanity had been filed. The court was engaged in an effort to determine whether the appellant was, at that time, of such mental capacity as to be able to consult with his counsel and make a reasonable defense. It is common knowledge in this jurisdiction that sanity trials occur in the circuit court only when insanity is a defense to a criminal charge.

This Court in Smith v. State, 95 Miss. 786, 49 So. 945, 27 L. R. A., N. S., 461 held that: "Where the defense is insanity, general or partial, the door is thrown wide open for the admission of evidence; every act of the party's life is relevant to the issue and admissible in evidence", citing authorities. The same rule was applied in Eatman v. State, 169 Miss. 295, 153 So. 381;

Hand v. State, 190 Miss. 314, 200 So. 258; Hinton v.
State, 209 Miss. 608, 45 So. 2d 805, appeal dismissed
and certiorari denied in the Supreme Court of the Unit-
ed States, 340 U. S. 802, 71 S. Ct. 68, 95 L. Ed. 590;
Denham v. State, 218 Miss. 423, 67 So. 2d 445. The Smith
case, supra, was also cited in Elmore v. State, 143
Miss. 318, 108 So. 722; Hoye v. State, 169 Miss. 111,
152 So. 644; Pullen v. State, 175 Miss. 810, 168 So. 69;
Williams v. State, 185 Miss. 449, 188 So. 316; Carter
v. State, 199 Miss. 871, 25 So. 2d 470; Ratcliff v. State,
201 Miss. 259, 29 So. 2d 321; Lewis v. State, 209 Miss.
110, 46 So. 2d 78; Rogers v. State, 222 Miss. 690, 76
So. 2d 831; Johnson v. State, 223 Miss. 56, 76 So. 2d
841, 81 So. 2d 558; Keeler v. State, 226 Miss. 199, 84 So.
2d 153; Burr v. State, 237 Miss. 338, 114 So. 2d 764.

 ██ Manifestly the bill of exceptions was both im-
perfect and insufficient. Under the foregoing authori-
ties, there was no error in overruling it.

## THE MOTION TO QUASH THE INDICTMENT.

 ██ The defendant, on his motion to quash the
indictment, called two witnesses, Ewart D. Lindsey,
Circuit Clerk since May 10, 1948, and Boyce Holleman,
District Attorney since February 8, 1953. Lindsey, at
the instance of defendant, described how the names of
potential jurors were actually selected by the super-
visors in accordance with the statutes of the State;
that those names were recorded on the minutes of the
board of supervisors; that a copy of such list was de-
livered to the circuit clerk; and that the clerk placed
such names in the jury boxes and sealed them. He ex-
plained that the application for registration provided
no place to show the color of the applicant. Neither
"white" nor "colored" appeared in such applications.
He estimated that about 29,000 white and about 2,300
colored persons were duly registered. He said that
Negroes had served on grand juries in such capacities

since he has been in office. Two had served on the first grand jury, and he recalled that others, since that time, had served on the grand jury. He said that, when the slips are put in the boxes, there is no way to tell whether the individual is Negro or white; and that there was no discrimination shown between the races in the drawing of the panels. During his tenure of office, he has observed a number of Negroes serving on the juries. There was nothing, prior to the time when they came into the courtroom, to designate jurors by race. He further said that, in proportion to the number of white and colored voters, the number of Negroes selected for jury service at least equaled, if it did not exceed, the proportionate number of white jurors. He knew that the names of Negroes were in the jury lists and boxes in his office at that time.

Boyce Holleman testified that quite a number of Negroes have served on the grand jury during his term of office. He remembered the names of two who served at the December 1959 and the June 1960 terms, and another at a different term which he could not remember. The witness sat in the grand jury room with each of these jurors for a week and talked to them a number of times. He said that a number of colored men had also served on petit juries and that two served during the past week. He said that there was no discrimination in the grand jury room. The Negroes performed a valuable function; and that Negroes have actually been accepted and served on juries. He remembered that one was accepted and served in the deliberations. Either the last week or the week before, two, whose names he gave, served. He remembered a number of such colored persons by face, who had served, but he did not remember their names. He remembered five or six who served on the grand jury whose names he could not give. The trial judge made the following statement in reference to this question: "Of course the Court also

has knowledge of the fact, having served during the last few years, that negroes have served on the Grand Jury in Harrison County, as well as Petit Jury. As a matter of fact, I have noticed of late that it would be an exception not to have a negro on the Grand Jury. We ordinarily do have one on the Grand Jury.''

The evidence of the only two witnesses whom the appellant placed on the stand on this issue, instead of sustaining the allegations of the motion, affirmatively showed that there was no discrimination whatever, and that Negroes had for a number of years · been listed for jury service and that they had actually served on both grand and petit juries. Appellant, therefore, did not meet his burden. His witnesses proved that the converse of his motion was true. Akins v. Texas, 325 U. S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692; Cf. Hernandez v. Texas, 347 U. S. 475, 74 S. Ct. 667, 98 L. Ed. 866. See also Kennard v. State, 128 So. 2d 572, not yet reported in the State Reports, and the authorities there cited. In the case of Johnson v. State, 223 Miss. 56, 76 So. 2d 841 81 So. 2d 558 (1955), there was a like motion to quash. Ewart D. Lindsey was the only witness in that case. The opinion said that the testimony of Lindsey ''shows without dispute that there has been no systematic exclusion of Negroes from juries in Harrison County, and that, in fact, at practically every term of court Negro jurors are drawn out of the box; and that no effort was made to discriminate either in selecting jurors for the box or on the particular grand jury and petit jury involved in this case, but appellant makes no showing whatever that there was any systematic exclusion of the names of Negroes from the jury box or panels. In fact, the evidence offered by appellant is to the contrary and negatives his allegation.'' The Supreme Court of the United States, on May 31, 1955, denied the petition of Johnson for a writ of certiorari. Ibid.

This Court, in Cameron v. State, 233 Miss. 404, 102 So. 2d 355, stated that since the decision of the United States Supreme Court in Patton v. Mississippi, 332 U. S. 463, 68 S. Ct. 184, 186, 92 L. Ed. 76, it is a matter of common knowledge that members of the boards of supervisors in most, if not all, of the counties of this State have been placing in the jury boxes the names of Negroes who meet the requirements of being men of good intelligence, sound judgment and fair character, and who do not possess the disqualifications enumerated in Section 1762, Mississippi Code of 1942. The same opinion recognized that it is not required that all the names of Negroes be placed in the jury box. This fact was reiterated in Kennard v. State, supra.

### THE VERDICT OF THE JURY — WAS IT CONTRARY TO THE WEIGHT OF THE EVIDENCE?

On the merits, the case appeared as follows: Mrs. Esco Broadus, with her husband, son of thirteen years, and daughter of fifteen months, on Sunday morning, April 23, 1961, went from their home, between Biloxi and Saucier, to Wiggins to visit a relative in the hospital. On the return trip, her husband stopped to visit his father, and she and the children drove on home. About an hour later, while the son was picking berries some distance away, Willie Wilson, at that time unknown to her, came to the back gate and inquired if someone was there who could give his car a pull. Mrs. Broadus told him that her husband would be home in a few minutes and he would give help. Appellant then asked for a drink of water, and she told him where the well was. She saw him apparently start back toward his car. Several minutes later, when she and her little daughter were in the den of the house, the door suddenly cracked open and there stood the appellant with an open knife in his hand. Immediately, in foul lan-

guage, he announced that he was there to have sexual intercourse with her and that he meant to do it. A struggle ensued. She fought and screamed and the baby screamed too. He said "What are you screaming for. I will kill you." He held a sharp pointed knife close to her heart. They struggled and fought all over the house until she was completely exhausted. Standing over her with the knife, he made her take off her pedal pushers and pants. Because of exhaustion and fear, she was compelled to submit to his forcible ravishment and sexual intercourse. It is unnecessary to chronicle the further details. Suffice it to say, this horrible experience, as narrated by the prosecutrix, made out a most aggravated type of felonious and forcible rape. Immediately upon the consummation, the defendant, still with the knife in hand, demanded money. Mrs. Broadus told him that she had no money because her husband had the billfold. She looked for her son's piggy bank at the place where it was usually kept but was not able to find it. When she finally located it, as she said, "The Negro had already set it out by the telephone." He took the bank, her son's radio, some watches, and a twenty-two rifle. After gagging and binding her, he left.

McArthur Moore, fourteen years of age, a cousin of Wilson, testified that he set out with Clifford Roundtree and the appellant that morning to go to the home of Johnny Moore, Jr. at McHenry. The appellant was driving his mother's car. They bought a half pint of liquor and each took a drink, but they did not drink all of the contents. They had passed some distance beyond the Broadus place when car trouble developed. The appellant told him and Roundtree to get some water. They went to the Broadus place and called, but no one answered. They then went to a pond, filled the jug with water, returned to the car and got in it. The witness went to sleep. The appellant woke him as he put

a twenty-two rifle, a radio, and a piggy bank in the car. After he did this, the appellant said that "the stuff was hot and they was liable to send him to the gas chamber." Shortly afterwards a car came along and pushed them off, but the car soon stopped again. At that time, the appellant opened the piggy bank, got the money, and threw the bank over the fence. He also threw some watches on the left side of the road and took off his shirt. In a short time, a highway patrolman stopped them. As the appellant saw the patrolman he said to Roundtree, "Clifford, I've got to kill him. With all this stuff he will send me to the gas chamber." Clifford said, "No, you ain't. Put that gun down." When the patrolman was getting out of his car, the appellant reached for the rifle, but Clifford made him put it down.

The recovered rifle, piggy bank, and radio were all identified by Mr. and Mrs. Broadus as property taken from the Broadus home at the time of the rape. Patrolman Dan Vernon, who made the arrest, saw the twenty-two rifle lying on the floor of the car at that time. He said that it was the same rifle which had been identified by the Broaduses.

The sole defense in this case was insanity.

Willie Mae Young, the appellant's grandmother, testified that he was born in Chicago, out of wedlock. He weighed four pounds and nine ounces. He lived with her practically all of his life, and was sickly until he was five or six years old. He attended school very little — went to some kind of training school — and they said they could not teach him anything. He can write his name, but is unable to read. He had a buzzing in his ear and convulsions until he was about eight years old. He was never normal like her children. He lied some. He would steal and fight. Lately he had been drinking. She thought he was weakened from the spells and did not know the difference between right and

wrong. On cross-examination, she said "I don't know where I would pronounce him crazy or not." After he got to be thirteen or fourteen years old, he began to steal. The authorities had him in Youth Court for stealing. She "got on him" and he said he was sorry, and that he would not do it anymore. On account of some other trouble, he was sent to the penitentiary for a year. He would always say that he was sorry after he did something wrong and that he did not know why he did it. After he got in this trouble, she went to see him and "bawled" him out. He told her he was sorry, and that he did not remember some of the things he did because he was drinking. He remembered getting some things, but "some thing they say I done, mamma, I don't know nothing about." As she talked to him, he told her not to break down. She said he was not crazy, that he was just nervous, and he looked then about as usual when he was frightened or nervous.

Mable Ann Kelly, the appellant's mother, testified that, as a child, he was queer. He was different from the other children and wanted to stay in the house and play by himself. She stated that, while he was employed at the R-C plant, he beat up a man, and lost his job; that he cut up a woman at Handsboro; that he lost his job at the Pepsi Cola Plant because of fighting; and that he hit a boy on the head with a jug of acid at Brooklyn. He also robbed her piggy bank. He would not apologize for what he did. It was her opinion that he is insane and has been that way all of his life, and that he did not know the difference between right and wrong. On cross-examination, she told about his sentence to the penitentiary, and that his wife had to go back to her people. She had let her little daughter go off in the car with him, and did not think he was crazy then. Neither did she think he was crazy when he married. She had never tried to commit him to an institution. She said that he was mean to her, to her

husband, to his little sister, to his grandmother, and to other folks. He would not listen to her or his grandmother. He would not mind. He would steal, take the money and have a good time with it, and run with the wrong crowd. She let him have her car on a Saturday to go to see his girl friend. She did not see it again until the following Wednesday, when the hose was pulled loose, the tires were flat, and the radio was gone. She said that he was mad with her because she called the police and told them where he was.

Dr. M. S. Love testified that, three or four years before this incident, he had treated the appellant for pneumonia, seeing him daily for a week. The only thing he noticed was that Wilson was of low mentality and did not associate events as well as one might. The witness was not a psychiatrist, and when asked whether, at the time he treated him, appellant knew right from wrong, he replied, ''I would hesitate to give my opinion on a thing like that.''

Dr. G. T. Sheffield, a well known and recognized psychiatrist who had been appointed by the court to examine the defendant, was called by the State in rebuttal. He observed the defendant during the sanity hearing and heard all of the witnesses testify. He also examined the accused privately for about thirty minutes. In addition to what he had seen and heard and his examination of the defendant, counsel for the State, by a hypothetical question, put before the doctor the substance of all of the testimony as to the life and conduct of the defendant, and inquired whether or not, at the time of the commission of the act of sexual intercourse, the defendant knew the difference between right and wrong, and the doctor answered ''I think he knew right from wrong.'' On cross-examination, when counsel was trying to get the doctor to say that the defendant had a mental age of only five years, the doctor replied that the defendant ''is up older than

that.'' The doctor pointed out that a premature and illegitimate birth has nothing to do with a man's development. Some are born prematurely and yet are brilliant. The appellant's account of what happened, namely, borrowing the car, sending the two for water, the details he went into regarding the act, his stealing, and what he said when he got back as to the articles being hot and they would send him to the gas chamber — all of this showed that he knew that he had done something wrong which might send him to the gas chamber.

Dan Vernon, one of the patrolmen, testified that the arrest was made about four or five miles from the Broadus home. He stopped his car about fifty feet from the approaching automobile, got out with a shotgun in his right hand, and held up his left as a signal to stop. The defendant, who was driving the car, indicated that he recognized the officer and stopped. He told the defendant to get out. The order was obeyed. Based on his observations from the time of the arrest until he was put in jail, the witness was of the opinion that the defendant was sane.

Under this point, the appellant argues that Dr. Sheffield's examination was not conducted for a sufficient time to exclude all reasonable doubt as to whether he knew the difference between right and wrong. In addition to the Mississippi statutes, the general law permits the court to call expert witnesses for the purpose of examining prisoners and testifying therefrom. 58 Am. Jur., Witnesses, Sec. 835, p. 468; Shipp v. State, 215 Miss. 541, 61 So. 2d 329; Rogers v. State, 222 Miss. 690, 76 So. 2d 831. In the Rogers case, supra, the two experts, under an order of the court, examined the accused for sanity on the day of the trial, and found no evidence thereof. Dr. Sheffield had examined the appellant, observed him during the first trial, and had heard all of the evidence relative to his sanity. It was

his opinion that the appellant knew right from wrong. Such contention of the appellant is therefore not well taken.

■ ■ On the merits, the evidence amply sustained the verdict of the jury in finding the appellant guilty of forcible and felonious rape beyond a reasonable doubt.

■ ■ On the question of insanity, the evidence in its entirety was sufficient to remove any reasonable doubt of the appellant's sanity, and to establish beyond reasonable doubt that he had the mental capacity to conduct a rational defense and that he knew the difference between right and wrong. As it was said by this Court in Singleton v. The State, 71 Miss. 782, 16 So. 295, "Nothing suggests a doubt of his sanity, unless it is the enormity of his crime, and it would be unsafe to indulge a presumption of a want of sanity from that * * *" Cf. Rogers v. State, supra.

## ADMISSIBILITY OF EVIDENCE AS TO ARMED ROBBERY.

■ ■ The defendant alone knew his purpose was in going to the Broadus home. After the rape, still in possession of the knife, he demanded money. According to Mrs. Broadus she was looking for the piggy bank where it was usually kept, but when she found it, it was located by the telephone. In other words, Wilson had apparently already found and taken the piggy bank before committing the rape. So, whether he went to the Broadus home to steal, or rob, or commit rape, or to do all of these things, is known only to him.

It must be remembered that only Mrs. Broadus testified as to the identity of the felon. In King v. State, 66 Miss. 502, 6 So. 188, the elemental rule was recognized that, in the trial of a criminal case, the testimony must be confined to the issue; and when the trial is for one offense, the prosecution cannot aid its proof by showing that the accused committed other offenses. But certain exceptions to the general rule were stated, to wit: "Where

the offense charged and that offered to be proved, *are so connected as to constitute but one transaction, or where it is necessary to identify the offender,* or where it is material to prove motive, and there is apparent relation or connection between the act proposed to be proved and that charged, or where the accusation involves a series of criminal acts which must be proved to make out the offense, *or where it is necessary to prove scienter or guilty knowledge, and the like * * *"* (Emphasis supplied.)

In Raines v. State, 81 Miss. 489, 33 So. 19, it was stated that a previous crime, committed by the defendant, can be proved only "(a) where it is connected with the one charged in the indictment, and sheds light upon the motive of defendant; or, (b) where it forms a part of a chain of facts so intimately connected that the whole must be heard in order to interpret its several parts; or, (c) in cases of conspiracy, uttering forged instruments or counterfeit coin and receiving stolen goods, for the sole purpose of showing a criminal intention."

In Floyd v. State, 166 Miss. 15, 148 So. 226, it was said: "There are exceptions to the rule which has been stated, such as *where the offense charged and that offered to be proved are so connected as to constitute but one transaction, or where it is necessary to identify the offender,* or where it is material to prove motive, and there is apparent relation or connection between the act proposed to be proved and that charged, or where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge and the like." (Emphasis supplied.)

In Clark v. State, 181 Miss. 455, 180 So. 622, the admission of evidence as to other offenses was held proper "when it has a direct bearing on the question at issue, or where there is an apparent relation or con-

nection between the act proposed to be proved and that charged.''

In May v. State, 205 Miss. 295, 299, 38 So. 2d 726, the Court applied the rule that ''evidence of other crimes is incompetent except to show identity, guilty knowledge, intent or motive, or where the offense charged is so interwoven with other offenses that they cannot be separated.'' See also Bangren v. State, 198 Miss. 359, 22 So. 2d 360; Steele v. State, 213 Miss. 739, 57 So. 2d 574; Seid v. State, 226 Miss. 886, 85 So. 2d 585.

Shay v. State, 229 Miss. 186, 90 So. 2d 209, was a rape case. Shay had taken several articles, including a cigarette lighter, from the victim at the time of the commission of the crime. In holding that these articles were admissible, the Court said: ''These incidents were so connected as to constitute a continuous transaction. Besides the cigarette lighter was of distinct value in establishing the identity of the assailant. The rapist had a flashlight and a revolver at the time; and a flashlight and a revolver were taken from the accused. It was not error to admit this evidence'', citing authorities.

In Keel v. State, 133 Miss. 160, 97 So. 521, the evidence which was admitted concerning other crimes, formed a part of the res gestae, and, for that reason, it was held to be admissible.

The appellant says that the case of Dabney v. State, 82 Miss. 252, 33 So. 973, is authority for his contention that it was error to admit the evidence of the prosecutrix to the effect that he took the articles of property following the rape. In that case, the trial court, over the objection of the defendant, permitted a witness to testify that he lived in a room adjoining the prosecutrix and that his trunk was broken open and a suit of clothes was stolen therefrom by the defendant about the time the woman claimed to have been raped. This Court, on appeal, held that such evidence was inadmissible. The

opinion recognized certain exceptions to the rule, and said that such proof is competent where the different crimes are parts of the system of crimes and where one crime is shown to be intimately connected with another so as to furnish the motive for the commission of the crime charged. It picked out and stated exceptions to the rule as pointed out in Shaffner v. The Commonwealth, 72 Pa. 60, 13 Am. Rep. 649, and State v. Raymond, 53 N. J. Law 260, 21 Atl. 328. Those principles are in accord with the exceptions which were enumerated in King v. State and Floyd v. State, supra, as well as the other authorities heretofore stated. One exception announced in State v. Raymond, the New Jersey case, supra, not particularly emphasized in the King and Floyd cases, supra, is "when one crime may have been perpetrated for, or as a means of committing, concealing, or escaping from another." •

In the above case, the larceny of the suit was of course evidence that Dabney was in the house about the time of the rape. However, that crime was committed against a different person than the rape victim. There was no evidence that the two crimes were interrelated, or that the theft was in any manner connected with the rape. On the contrary, the taking of the rifle, the piggy bank and the radio was evidence to establish the identity of the rapist. He had them in his possession when he returned to the car. After these articles were later obtained, they were strong corroboration of the charge of the prosecutrix. The rapist took these articles away — he had them in his possession a few minutes later — the rifle was actually recovered from him at the time of the arrest. Mrs. Broadus was the only person who could identify the rapist, and she had never seen him before. Corroboration is eagerly sought, especially in rape cases, and this evidence was admissible to show that both crimes were committed by the same person at the same time. The two offenses were com-

mitted in one transaction and cannot be dissociated one from the other. Besides, the taking of the rifle and the money can very well indicate that his object in so doing was to effectuate his escape from detection of the crime of rape.

The Court, in the Dabney case, supra, justified the exclusion on the ground that it was wholly unnecessary to admit the evidence for the purpose of identifying the accused, saying that "the other proof in the case abundantly identified the defendant." Such other evidence was not disclosed in the opinion. Be that as it may, this Court is of the opinion that the Dabney case has no application here. The other case of Skinner v. State, 198 Miss. 505, 28 So. 2d 501, involved offenses at different times and of course is inapplicable to the facts in this case.

From what has been said, the Court has concluded (1) that the trial court in no way erred in the manner in which it dealt with the requested bill of exceptions; (2) that the trial court properly overruled the motion to quash the indictment because the evidence wholly failed to show any discrimination in the selection of jurors; (3) that the verdict of the jury was not only not against the great weight of the evidence, but that the same was fully sustained by, and was in accordance with, the overwhelming weight of the evidence; and (4) that there was no error in the admission of the evidence of another crime which occurred at the same time when, and the same place where, the crime of rape was committed.

This record has been scrutinized with great care. It has been studied and thoroughly considered. The Court has been unable to find any prejudice or reversible error. The appellant was afforded a fair and impartial trial. His guilt was established beyond every reasonable doubt. The judgment must therefore be affirmed.

Affirmed; and Friday, May 11, 1962, is fixed as the date for the execution of the death penalty in the manner provided by law.

All Justices concur.

CLARKE COUNTY COOPERATIVE (AAL) *v.* READ

No. 42270 April 2, 1962 139 So. 2d 639

*Billy E. Harris, A. J. Reese,* Quitman, for appellant.

*McFarland & McFarland,* Bay Springs, for appellee.

*Carter & Mitchell,* Jackson, amicus curiae.

McElroy, J.

This is an appeal from the Circuit Court of the First Judicial District of Jasper County, Mississippi. The action is on a promissory note given by the appellee, W. H. Read, to the appellant, Clarke County Cooperative (AAL). The Clarke County Cooperative, a domestic corporation organized and existing under the laws of the State of Mississippi, was incorporated under the Mississippi Agricultural Association Law (AAL) with its office and principal place of business in the City of Quitman, Mississippi. The Cooperative was engaged in the business of selling feed, fertilizer, seed, farm supplies and general merchandise.

W. H. Read bought farm supply items and signed a note on October 7, 1959, to cover an indebtedness of $4,281.35. The note was to mature in six months, April 7, 1960, and was to bear six per cent interest from October 7 and a reasonable attorney's fee. The appellee defaulted and although repeated demands were made

upon him, he paid no part of the note. Suit was filed December 10, 1960.

Appellee filed his answer which admitted the validity of the promissory note but denied that he was indebted to the appellant in the sum of $4,281.35. He admitted that he owed the sum of $1,114.08. A set-off was filed with his answer stating that the Clarke County Cooperative owed him "equities" for the years 1953-1958.

In the set-off, Read alleged there was a mutual indebtedness between the appellant and the appellee and that the Cooperative was indebted to him in the following amounts: Equities owing to Read by the Cooperative were $1,803.96. He alleged that in 1959 a rebate on poultry merchandise purchased was $526.18, plus interest. From May through October 1959, he lost 455 hens at $2 each for a total of $910. The total amount of the indebtedness to him from the Cooperative was $3,240.14. The total amount owed to appellant by appellee was $1,-114.08. Read swore to this set-off.

The appellant's answer to the set-off stated that "the said plaintiff is controlled and governed by laws of the Clarke County Cooperative". A sworn certified copy of the by-laws was attached as Exhibit A to the answer. There was shown, by virtue of Article 8 of said by-laws, a certified copy of the appellee's record of equities as recorded in the patron's record of equity book which was attached as Exhibit B to the answer. It denied owing the defendant-appellee anything.

It is well settled that equity credits allocated to a patron on the books of a cooperative do not reflect an indebtedness which is presently due and payable by the cooperative to such patron. Such equity credits represent patronage dividends which the board of directors of a cooperative, acting under statutory authority so to do, has elected to allocate to its patrons, not in cash or other medium of payment which would immediately take such funds out of the working capital of the co-

operative, but in such manner as to provide or retain capital for the cooperative and at the same time reflect the ownership interest of the patron in such retained capital. The interest will be paid to the patron at some unspecified later date to be determined by the board of directors of the cooperative. The word "capital" is intended to denote that capital which is of a nature comparable to the earned surplus of a conventional business corporation. The patron has no right to offset such equity credits, not being an indebtedness which is presently due and payable, against an indebtedness which is presently due and payable by him to the cooperative.

In ██ ██ Kershaw v. Merchants Bank of New York, (1843) 7 How. 386, 393, said: "It is held to be a general rule that a plea of set-off should disclose such a state of facts as would entitle the party pleading it to sustain his action if he were plaintiff."

In Griffith's Mississippi Chancery Practice, Sec. 521, p. 583 (2d Ed. 1950), it was said: "The transactions must have been of such a nature that at the date of institution of the suit the defendant on his part could have instituted a good separate suit against the complainant for the item constituting the set-off."

See also Canal-Commercial Trust and Savings Bank v. Brewer, 143 Miss. 146, 108 So. 424; General Motors Acceptance Corp. v. Trull, 166 Miss. 490, 148 So. 390 and 80 C. J. S., Set-Off and Counterclaim, Sec. 25, p. 34.

The appellant is a cooperative organized and existing under the Agricultural Association Law of the State of Mississippi, Miss. Code 1942, Rec., Secs. 4475-4493. Section 4482 provides that the affairs of such a cooperative shall be managed and controlled by its board of directors. Section 4486 provides that such organizations are authorized and empowered to acquire and own properties, plants, and other facilities which may be necessary or useful in aiding the cooperative to serve its members. Section 4487 provides a means for such a co-

operative to obtain the necessary funds or capital to pay the expense of its operation and to acquire those facilities which are necessary or useful to the cooperative in rendering service to its members. That section provides as follows: ''Such incorporated association may make charges to its members and deductions from the proceeds of their products for services rendered to them for the purpose of paying the expenses of operation and maintenance and development of such association, and for the creation and maintenance of reserves for the purpose of paying expenses, retiring obligations, acquiring, maintaining and operating property necessary or useful in carrying out the purposes of this act and for caring for contingencies, and such reserves may be used or distributed as may be deemed proper by the board of directors under the by-laws; and such corporation may make patronage dividends or distributions to its members and may do any and all things not unlawful in carrying out the purposes of this act, and shall have and enjoy all the rights, privileges and immunities of other corporations not inconsistent with this act.''

The by-laws provide: ''(2) Such dividends shall be paid either in cash or by credits allocated to the patrons in the Record of Patrons' Equities, or partly in accordance with each of said methods. 'Sec. 9. From time to time as cash may be on hand and available, not needed as an operating fund or for other necessary purposes of the association, the board of directors shall provide for a distribution to be made to the patrons for the purpose of retiring and paying equity credits as shown in the Record of Patrons' Equities. When such payment in cash is made, the oldest equity credits shall be first paid and retired.

'' 'In any year in which the association may sustain a deficit from its operations, the directors shall have the right to apportion such loss against the accumulated patrons' equities in an equitable manner; and any such

application shall ratably reduce the face value of such equity credits, in the redemption thereof'.''

In Sovereign Camp Woodmen of the World v. Woodruff, 80 Miss. 546, 32 So. 4, this Court said: "The constitution and laws of a benefit society are binding upon it and upon all its members and may be considered as written into contracts between it and its members . . .''

Again in Maas v. Sisters of Mercy of Vicksburg, 135 Miss. 505, 99 So. 468, this Court said: "Clearly the constitution, by-laws and usages of the Sisters of Mercy constitute so far as they deal with their civil rights a binding contract between them. . .''

To the same effect are Newman v. Supreme Lodge Knights of Pythias, 110 Miss. 371, 70 So. 241; Supreme Lodge Knights of Pythias v. Stein, 75 Miss. 107, 21 So. 559; Sovereign Camp, Woodmen of the World v. Miller, 125 Miss. 502, 87 So. 892 and Butler v. Eminent Household of Columbian Woodmen, 116 Miss. 85, 76 So. 830. Compare 18 C. J. S., Sec. 181 at 591 and Fletcher, Cyclopedia Corporations, Permanent Edition, Vol. 8, Sec. 4198 at 753.

Dealing specifically with the binding effect of the by-laws of an agricultural cooperative upon the members of the cooperative is the case of Arkansas Cotton Growers Co-op Assn. v. Brown, 168 Ark. 504, 270 S. W. 946 where the court said: "In fact, it is settled law that the by-laws of a corporation evidence the contract between it and its members of stockholders and govern the transaction between them.''

To the same effect is Washington Cooperative Egg and Poultry .Association v. Taylor, 122 Wash. 466, 210 P. 806, and Young v. West Ark Production Credit Association (Arkansas 1953), 257 S. W. 2d 274.

A patron of a cooperative having by-laws such as appellant, is bound by such by-laws and cannot contend that when equity credits are allocated upon the

books of the cooperative that an indebtedness is thereby created which is immediately due and payable to him by the cooperative.

The record in the present case reflects that the appellant, in the exercise of its statutory and by-law rights so to do, had established reserves and thereby acquired the capital needed for its operations. This was done through means of the cooperative's crediting its annual "net savings" or profits to the record of patron's equities rather than paying such savings to the patrons in cash, for a cash payment would of course have depleted the funds which were available to the cooperative for the purpose of carrying on and developing its business.

Equity credits are in effect the capital of the cooperative and the revolving-fund plan or equity plan, as in Mississippi, for raising such capital is the most equitable means by which a cooperative can acquire its capital from its patrons. See Bowles v. Inland Empire Dairy Association (D. C. of N. D., 1943) 53 F. Supp. 210, 216, where the court said:

"Plaintiff contends that Defendant has no right to pay dividends out of its present earnings to those who, in past years, have furnished reserves by which defendant was capitalized. In this he challenges the revolving-fund plan of cooperative financing. 'The problem of how equitably to capitalize a cooperative so that the capital furnished by a particular member will bear a direct relation to his patronage and ultimately will be returned to him is believed by many competent cooperative leaders to be solved best through the use of the revolving-fund plan of financing.' 'Legal Phases of Cooperative Association,' Hulbert, F. C. A. Bulletin No. 50, May, 1942, p. 276. See also, Sanders, 'Retains That Nobody Feels,' 3 News for Farmer Cooperatives 5-6, Farm Credit Administration, 1936; Sanders, 'Organizing a Farmer's Cooperative,' Farm Credit Adminis-

tration Cir. C-108, 42 pp., 1939. Plaintiff complains that defendant waited so long to retire these revolving-fund obligations. The reason for this is explained by Hulbert ('Legal Phases of Cooperative Associations', p. 276) as follows: 'The derivation of the name revolving-fund plan becomes more apparent when an association reaches the stage where the oldest investment of the patrons of previous years may be retired. It is only when an association reaches this stage that its revolving-fund begins to revolve. Accumulations or retains for capital purposes, under this plan of financing, should be at least recorded on the books of the association as credits in favor of the proper persons. (This is what the Defendant did.) The revolving-fund plan of financing is believed to be the most practicable way of insuring that ultimately all the major contributions of patrons to the assets of an association may be returned to them. The fairness of the plan should make it easier for an association to obtain members and to build up an adequate capital. It provides a means by which the capital of an association increases as its volume of business increases. Many of the most successful agricultural cooperatives use this method of financing. It is being adopted not only by new associations but by associations which have been operating for many years.' The validity of the revolving-fund plan of financing has been specifically recognized by the Courts. Reinert v. California Almond Growers Exchange, 9 Cal. 2d 181, 70 P. 2d 190; Adams v. Sanford Growers' Credit Corporation, 135 Fla. 513, 186 So. 239; Ozona Citrus Growers Association v. McLean, 122 Fla. 188, 165 So. 625; Proodian v. Plymouth Citrus Growers Association, 143 Fla. 788, 197 So. 540; Parker v. Dairymen's League Cooperative Association, Inc., 222 App. Div. 341, 226 N. Y. S. 226; Loomis Fruit Growers' Association v. California Fruit Exchange, 128 Cal. App. 265, 16 P. 2d 1040.''